E. R. JULIAN, Appellee, v. THE EAGLE OIL AND GAS COMPANY, (Defendant), and W. R. PARSONS et al. (Interpleaders), Appellants.

No. 16,653.

SYLLABUS BY THE COURT.

1. WRITTEN AGREEMENT—Parol Evidence Not Prejudicial. A written agreement for drilling oil wells is examined, and it is held that the admission of parol evidence relating to one of its provisions was not prejudicial.

2. FINDINGS—Evidence—Testimony Introduced but Not Abstracted—Presumption. Testimony introduced but not abstracted will be presumed to be sufficient to support a finding based thereon.

3. FORFEITURE—*Lease "Assailed for Any Debts" of Lessee—Attachment.* A condition in an assignment of an ordinary oil-and-gas lease that if the interest conveyed by such assignment should be assailed for any debts of the assignee the rights and privileges so assigned should be forfeited to the assignors is held to be valid.

Appeal from Neosho district court. Opinion filed July 9, 1910. Modified.

*John J. Jones,* and *James W. Reid,* for the appellants.
*H. P. Farrelly,* and *T. R. Evans,* for the appellee.

The opinion of the court was delivered by

BENSON, J.: This action is to recover a sum claimed by E. R. Julian against the Eagle Oil and Gas Company for drilling oil wells under a written contract. An attachment was levied upon property a part of which is claimed by W. R. Parsons and F. A. Parsons, who are interpleaders. The judgment was for the plaintiff against the oil and gas company, and for the sale of the attached property. The defendant and the interpleaders appeal.

The following is a copy of the contract:

"April 5, 1904.
"Memorandum of agreement made this date between E. R. Julian, first party, Eagle Oil and Gas Company, second party, witnesseth:

"First has drilled well No. 4 on the Yockey land for second party, and agrees to drill two more wells on said land, as located by second party, on the following terms and conditions: The wells to be drilled in as directed by first party with casing to the sand, cleaned, casing pulled and wells completed in good condition—the price to be one dollar per foot for drilling a completed well, twenty-four hours time to be given for cleaning, pulling casing, tubing, etc., extra time to be $25 per day.

"First party is allowed to take gas from the wells on said land provided there is gas enough for him after second party is supplied; the price to be 4c per foot for well No. 5 and 5c per foot for all other wells drilled for

the depth of the well drilled. It is understood and agreed that first party shall wait for payment for all said wells drilled, including No. 4, until second party sells oil enough to pay all debts and bills due and incurred in the said drilling, when first party is to be paid from oil then sold."  ·

The petition states that the plaintiff drilled four wells after this agreement was made, numbered 5, 6, 7 and 8; that numbers 5 and 6 were paid for, leaving $1158.98 due for numbers 7 and 8. It also stated "that the terms and provisions of said contract relating to the payments to be made to the plaintiff, as above stated, are not entirely clear and somewhat ambiguous, but that the true and correct construction of said contract, and the real contract between plaintiff and defendant, was and is that all moneys received from the sale of oil from said premises, less the incidental expenses of pumping and marketing the oil, should be applied from time to time upon said contract and paid to plaintiff for the drilling done by the plaintiff under said contract." The petition further alleges that instead of applying upon the plaintiff's claim the money obtained from the oil that had been marketed, less the incidental expense, as agreed, the defendant had diverted and misapplied it, and that if the money had not been misapplied it would have been sufficient to pay the plaintiff's claim.

The defendant answered that by the terms of the agreement the plaintiff's claim was not due, and that its receipts from the sales of oil from the Yockey land had not been sufficient to pay all the expense of drilling and the debts and bills due at that time.

On the trial the plaintiff, as a witness in his own behalf, was asked what was the agreement as to payments for the drilling. This was objected to by the defendant. Thereupon the following occurred:

"The Court: Is that the written contract that you refer to?

"Mr. Farrelly: Yes. The contract is ambiguous, and

9—83 KAN.    ·

it is for your honor to pass upon; Mr. Jones himself said in his opening statement that it was ambiguous.

"Mr. Jones: That last clause is not very explicit or plain what debts should be paid before Mr. Julian received his money. That is the way it looks to me. I want to be frank about it.

" (The Court examines the contract.)

"The Court: All right. You can go ahead with your examination.

" (Defendant excepts.) "

The witness then stated:

"It was understood and agreed between Mr. Parsons and myself that I was to receive the money from the oil after the running expenses and expenses of drilling those wells that I drilled were paid; the expenses of the drilling incurred in those wells that I drilled, numbers 4, 5, 6, 7 and 8. After this money—after the expenses of these wells were paid and the running expenses of the property, I was to receive the money from all of the oil that was then sold; that was our agreement.

"Ques. Net receipts? Ans. Yes, sir; net receipts. It didn't include any outside notes, or anything like that. It was just the debts incurred in drilling, is what our contract reads."

The witness further testified that he received the net proceeds until about November, 1906; that since then three-fifths of the proceeds had been applied to outside indebtedness, against his protest. The books of the defendant were then introduced to show the receipts from, and expenses of, the wells on this lease, and, subject to objection for incompetency and irrelevancy of the evidence under the pleadings, it was agreed that the court should examine the books and determine what were the proper items of expense to be allowed. A demurrer to the evidence was overruled.

The defendant called its manager, who had signed the contract, and he testified to his understanding as to the indebtedness that was to be paid before the plaintiff's claim was to become due. The court found for the plaintiff.

Julian v. Oil Co.

The defendant contends that only two wells were provided for in the agreement, and that, as the suit is upon the agreement only, there can be no recovery. The evidence, however, shows that both parties treated the drilling of wells numbered 7 and 8 as being done under the contract. Partial payments were made accordingly, and this was the manifest intent of the parties. The trial proceeded upon that theory, and it can not be departed from in this court.

The defendant next insists that the evidence failed to show that anything was due when the suit was brought. It is said that the clause in the agreement claimed to be ambiguous is clear in its meaning and that the parol evidence was therefore improperly admitted. The evidence of the plaintiff, however, did not vary the terms, as we interpret them. "Debts and bills incurred in said drilling" appears to refer to drilling done under the contract, including well No. 4, and not that done on other contracts or for other purposes. As the finding of the court upon the evidence was in harmony with this interpretation, any error in receiving it must be disregarded. If, however, it should be held that the contract is ambiguous (as defendant's counsel seemed to concede when the evidence was offered), then it should also be held that the evidence was properly received, and in that case the finding thereon would be conclusive. In either view the defendant has no cause to complain.

It is also urged that the abstract shows the absence of any evidence that the defendant had sold oil "enough to pay all debts and bills due and incurred in said drilling," as stipulated in the contract. Evidence was given of the receipts from wells on this lease, and the books of the company were in evidence showing the expense of operation. The defendant, although alleging error in the judgment, did not abstract the evidence so given from the books. The court will therefore presume that it was sufficient, in connection with the

other evidence, to support the finding. Besides, the counter abstract shows this to be true.

Another question is presented upon the appeal of the interpleaders. This interplea alleged that the plaintiff had attached the oil-and-gas wells on the Yockey lease, machinery, tanks, pipe lines, casing and gas-well machinery, tools and appliances, and the oil in tanks, as the property of the defendant company; that this lease was owned by the interpleaders on February 13, 1904; that on that day they had made an assignment thereof to the defendant company, whereby that company was bound to deliver to them one-eighth of the oil and gas produced thereon; and that the assignment provided:

"That said premises should be exempt from any indebtedness of the said Eagle Oil & Gas Company, and should not be in any manner encumbered by said company or be subject to any indebtedness incurred by the defendant company in its operations, beyond or further than said company's share of oil or gas actually produced by it from said premises, and that if at any time the property or the title and interest conveyed by said assignment should be assailed for any debts of the said defendant, the Eagle Oil & Gas Company, the rights, privileges and the property assigned by said instrument should be forfeited to the said W. R. Parsons and F. A. Parsons, interpleaders herein."

The court ordered that all the attached property should be sold to satisfy the plaintiff's claim. The decree contained the following:

"It is further considered, ordered and adjudged by the court that the premises conveyed by the interpleaders, F. A. Parsons and W. R. Parsons, to the defendant company, be and they are hereby reconveyed and ordered delivered up to them, subject to the attachment lien of the plaintiff, E. R. Julian, and the sale of the attached property, as hereinbefore adjudged and decreed."

The interpleaders complain of this decree and contend that the attachment should be discharged from the lease. When the attachment was levied the defendant

had an interest in the property, subject to levy. The forfeiture clause was not self-executing and might have been waived, and it is insisted by the plaintiff that this claim of forfeiture can not be litigated in this action. The statute provides that anyone claiming the attached property may interplead in the attachment action, and he is not compelled to resort to an independent suit. (Code 1909, § 45.) All parties were before the court, and no good reason appears why the question of forfeiture should not be determined in this action, along with the right of the plaintiff to subject the attached property to the payment of his claims, and this we believe is the better practice.

The remaining question is whether the forfeiture clause in the assignment is valid. It must be remembered that this is not the case of a condition subsequent in a grant in fee, which might be held repugnant to the grant, and therefore void, but the condition here is in an assignment of a lease for years. In volume 1 of the second edition of Wood's Landlord and Tenant it is said:

"It is competent for the lessor to limit the estate as he pleases, and if he expressly provides therein that the lease shall cease if taken upon execution or otherwise by operation of law, the provision is valid and operative." (p. 719.)

Another text-writer says:

"The landlord may stipulate that the lease shall not pass by operation of law, so that even an involuntary assignment of the lease will work a forfeiture. As where one leased a farm for twenty-one years, if the lessee and his executors should so long continue to occupy it, stipulating that he should not let, assign, or otherwise part with the lease; and the tenant, having become bankrupt, made an assignment, and his assignees sold the lease, it was held that the landlord had a right to enter when the insolvent quit the occupation of the premises. And wherever the tenant holds his estate under an express condition to keep it in his own possession, with a proviso that it shall cease upon its being taken in execution, the estate will terminate upon

the premises being taken under execution, if it puts an end to his occupation." (Taylor, Land. & Ten., 9th ed., § 409.)

In *Davis v. Eyton,* 7 Bing., n. c., [Eng.] 154, the court considered a lease containing the following provision:

"That if the lessee should commit an act of bankruptcy, whereon a commission should issue, and he should be declared bankrupt, or if he should become insolvent, or incur any debt upon which any judgment should be signed, entered up, or given against him, and on which any writ of *fieri facias* or any other writ of execution should issue, it should and might be lawful for the lessor to reënter into the demised premises, and the same again to have, repossess, and enjoy, as in his former estate." (p. 154.)

A judgment having been entered against the lessee and a *fieri facias* issued, under which his stock was sold, it was held that the lessor who had reëntered for condition broken was entitled to the emblements, the lease being forfeited. In the opinion, Tindal, C. J., said:

"The estate of the lessee was certain at first, but liable to be defeated by a condition which he allowed to be inserted in the contract, and which was a lawful condition. It is sufficient that the condition was broken, to see that the landlord enters on his title paramount, and takes the property then as he had it originally." (p. 158.)

The same rule is applied where the condition in a term for years is that it shall be forfeited in case of the bankruptcy of the lessee. (*Doe v. David and Others,* 5 Tyr. [Eng.] 125.) In *Farnum v. Hefner,* 79 Cal. 575, it was held that under a covenant in a lease against assignment a sale upon execution or through bankruptcy or the like did not afford cause for forfeiture, but the court said:

"If the landlord desires to avoid such involuntary transfer of the leasehold interest of the tenant, he may provide expressly in his lease that such transfer of the

Julian v. Oil Co.

property shall work a forfeiture, and the same will be effectual." (p. 581.)

It will not be doubted that a provision that the term should not be assigned might be made a valid condition subsequent in a lease or in an assignment thereof. The condition might also be written so as to include an involuntary transfer through legal proceedings against the lessee or assignee. It would seem that the levy of an attachment or an execution, which might in the orderly course of practice result in such a transfer, might also be made a condition for a breach of which the term should be forfeited. "Assailed for any debts" is the practical equivalent of a levy by attachment or execution.

It is not necessary to distinguish between an oil-and-gas lease like the one under consideration and an ordinary lease of land. The principle upon which such a condition may be upheld in the latter applies to the former with equal force.

The judgment in favor of the plaintiff against the defendant is affirmed. The order directing the sale of the attached property should be modified so as to provide for the sale of all the attached property except the specific title and interest in the Yockey lease which was transferred by the assignment from the interpleaders to the defendant. The cause is remanded for such modification.